IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TARLETON LLC, an Oregon limited
liability company

                Plaintiff,

     v.

STATE FARM FIRE AND CASUALTY
COMPANY, an Illinois insurance business
corporation,

                Defendant.

Case No. 3:12-cv-00989-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

This case arises out of a dispute between Tarleton LLC ("Tarleton") and State Farm Fire and

Casualty Company ("State Farm") over the meaning of and coverage by an "all risk" property

insurance policy. Tarleton alleges State farm improperly denied its insurance claim after a partial

collapse of a building Tarleton owns ("the Building"). State Farm now moves for summary

judgment on Tarleton's claims. The court concludes there is no coverage for the collapse under the

policy and no genuine dispute of fact exists that the collapse was not directly and immediately

OPINION AND ORDER - 1

[RMD]

caused only by the weight of contents and equipment in the building.  Accordingly, summary judgement in State Farm's favor is granted.

*Factual Background*

The Tarleton Building is a partial two-story built in the 1940s and framed with five wood bowstring roof trusses.  (Declaration of Brian Hickman in Support of State Farm Fire and Casualty Company's Motion for Summary Judgment ("Hickman Decl.") Ex. 4 at 3.)  It originally served as a farm-supply store, but was converted into an office building during the 1970s.  (Hickman Decl. Ex 4 at 3.)  Tarleton acquired the building in 1998, and since then has leased the Building for use as an office.

Tarleton purchased an "all-risk" property insurance policy ("the Policy") from State Farm insuring the building from August 1, 2005 through August 1, 2012.  (Declaration of Christopher C Grady in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Grady Decl.") Ex. 13.)  The Policy insures against "accidental direct physical loss" to covered property, but contains an "Amendatory Collapse Endorsement" ("Collapse Endorsement"), which specifies State Farm will cover losses resulting from a building collapse only if the collapse is "directly and immediately cause[d] only by one or more of the following:"

> a.  any of the "Specified Causes of Loss"[1] or breakage of building glass, only as insured against in this policy.
> b.  weight of contents, equipment, animals or people
> c.  weight of ice, snow, sleet or rain which collects on a roof; or
> d.  use of defective material or methods in the construction (includes remodeling or renovation) of the building if the collapse occurs during the course of the construction of the building.

---

[1]The "Specified Causes of Loss" under the policy are: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; falling objects; weight of snow, ice, or sleet; and water damage.

(Grady Decl. Ex. 13 at 47.)

Over the years, Tarleton commissioned several improvement projects to the Building. In 2005, Tarleton hired Mark Nelson ("Nelson") to update and remodel the Building (the "2005 remodel"). (Hickman Decl. Ex 4 at 1-2). During the 2005 remodel, Nelson added ceilings, platforms, duct work, steel pipes, electrical equipment, mechanical equipment, and sprinklers to the Building. (*Id*. 4-5, Ex. 11 at 4-5.) Unfortunately, Nelson failed to analyze the impact of the added infrastructure on the original trusses which were not designed to withstand significant dead loads. In 2006, one of the bowstring trusses ruptured, causing a collapse. (Hickman Decl. at 1, 5.) Nelson again designed and implemented repairs. (*Id*.) Thereafter, Tarleton installed conditioning units, "wires, suspended ceilings, ceiling joists, and insulation," all of which exerted dead weight on the trusses. (Gilbert Decl. at ¶ 5.)

In July 2011, another truss ruptured, fell five to eight inches, and landed on a non-load-bearing wall ("2011 collapse"). (Hickman Decl. Ex. 4 at 5.) Tarleton filed an insurance claim with State Farm to cover the loss and hired Nelson to design repairs and determine the cause of the collapse. (Gilbert Decl. at ¶ 9.) Nelson recommended that Tarleton hire Wade Younie ("Younie"), a specialist in wood bowstring truss systems, to analyze the collapse and design permanent repairs for the Building.[2]  (*Id*. at ¶ 8.)

On July 22, 2013, Younie issued an expert-witness report pursuant to Federal Rule of Civil Procedure 26 outlining his investigation, analyzing the likely causes of the collapse, and recommending repairs (the "Younie Report"). (Hickman Decl. Ex 4.) In that report, Younie articulates his conclusions regarding the 2011 collapse:

---

[2]Younie also serves as Tarleton's expert witness in this action.

1.  The sudden roof collapse in 2011 caused property damage to the building.  The bottom chord of Truss D ruptured suddenly and the truss fell 5 to 6 inches at the time of the rupture, crushing the non-structural demising wall.  The wall prevented the truss from falling onto the floor.

2.  The roof collapse in 2011 was directly and immediately caused by the weight of the contents and equipment.  Over the years, ceilings, roofing, access platforms, draft-steps, mechanical and electrical equipment were added.  This added weight of contents and equipment overloaded the truss.

3.  The roof collapse was triggered by a sudden rupture of the bottom chord at one of the splice connections at Truss D.  Examination of the splice joint found a wood failure near a knot in the wood.

4.  Mark Nelson could have prevented the roof failure in 2011, but failed to fully understand the hazards associated with the trusses supporting the roof of the Tarleton Building.  Mr. Nelson has involvement with the building dating back to 2005, but never considered checking the bowstring trusses for fitness for continued service.  He went through the collapse of the similar Truss C in 2006 and never warned the owners that the building was unsafe after the truss repairs were completed in 2006.

5.  In 2005, Mr. Nelson allowed the addition of new mechanical equipment and ceilings to the roof without any analysis or evaluation of the five trusses.  Even after Truss C suddenly collapsed in 2006, Mr. Nelson did not analyze the truss or evaluate the cause of the failure.  His repairs only addressed the failure of truss C.  He failed to warn the owners, in such a way that they could understand the immediate danger still associated with the other four trusses.

6.  The work performed in 2011 to 2012 by DCI and Conway General Contracting was reasonable and necessary to repair the property damage involving the 2011 roof collapse.

(*Id*. at 1-2.) Younie also opined in his report that several other factors likely contributed to the 2011 collapse. (*Id*. at 4-9.)  In the "Analysis" section of the report, Younie notes that, "the timber used to fabricate the wood trusses was 'installed green.'" (*Id*. at 5.)  Green wood, he explains, shrinks as it dries, causing minor ruptures in the wood.  (*Id*.)  Younie also noted that high attic temperatures in July 2011, likely "trigger[ed]" the collapse.  *(Id*. at 8.)  Ultimately, Younie concluded that "the sudden roof collapse in 2011 was directly and immediately caused by the weight of contents and equipment, but the wood deterioration and elevated attic temperatures contributed to the collapse."  (*Id*.)

When Tarleton filed the insurance claim, State Farm hired engineer Nathan White ("White") to investigate the collapse.  (Grady Decl. Ex 11.)  White issued a report explaining his analysis of

the collapse (the "White Report") as well as a second report rebutting the opinions expressed in the Younie Report (the "White Rebuttal Report"). (Grady Decl. Exs. 11, 12.) In his report, White concluded:

> We do not believe that the [truss] failure can be attributed to any particular single event. Rather, the damage appears to be the result of inadequately-sized truss members and connections from the original design and construction, with a progression of degradation of truss integrity over many decades along with likely increases in dead loads, which finally reached a tipping point . . . .

(*Id*. at 25.) The White Rebuttal report is irrelevant to the court's decision here except for White's rebuttal of "DCI Conclusion No. 2: '*The roof collapse in 2011 was directly and immediately caused by the weight of contents and equipment . . .*'" (*Id*. at 1.) White disagrees both with Younie's use of the word "immediate" as well as the word "direct." Regarding "direct," White opines: "the failure was not *directly* caused by the weight of additional contents and equipment; rather, the original inadequate design with long-term degradation, and to a lesser extent influence from slight increases in load, caused the failure in July 2011." (*Id*. at 2.)

On the basis of White's conclusions, State Farm denied Tarleton's insurance claim, prompting Tarleton to file suit to recover damages it claims are owed to it under the Policy. Tarleton also filed a parallel suit in Oregon State court against Nelson for negligent design and repair. (Hickman Decl. Ex. 5.) State Farm now moves for summary judgment on all of Tarleton's breach of contract claim and asks the court to strike portions of the Declaration of Wade Younie in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Younie Declaration") which are inconsistent with Younie's deposition testimony and Rule 26 report.

*Legal Standard*

OPINION AND ORDER - 5                                                                                    [RMD]

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).  The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the movant meets his burden, the nonmovant must "go beyond the pleadings [ ] by her own affidavits . . . [to] designate specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks omitted).  On summary judgment, the court is bound to view all facts in a light most favorable to the nonmovant and must draw all justifiable inferences in the nonmovant's favor. *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

*Discussion*

I.  Admissibility of the Younie Declaration under the Sham Affidavit Rule

State Farm moves to strike the portions of the Younie Declaration on grounds that the Younie Declaration is a "sham" created only to create a question of fact and thereby avoid summary judgment.  Tarleton opposes State Farm's motion and argues that Younie's opinion on the issue of attic temperature has remained consistent since this case was filed.  To the extent there is inconsistency, Tarleton claims, it is a question of fact for the jury to resolve.

The general rule in the Ninth Circuit is that a party cannot artificially manufacture a genuine issue of fact, and thereby avoid summary judgment, by submitting an affidavit which contradicts prior sworn testimony. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility

of summary judgment as a procedure for screening out sham issues of fact." *Id*. However, because of the jury's role in resolving questions of credibility, courts have urged caution when applying the sham affidavit rule. *Id., citing Kennet Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980). To this end, the Ninth Circuit requires the court to make certain factual findings before striking a declaration as a sham. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). First, the court must find that the affidavit is sham, or created specifically to avoid summary judgment; and second, that the inconsistency between the prior sworn testimony and the declaration is "clear and unambiguous." *Id.*

A. *Preliminary questions.*

Before the court may apply the sham affidavit rule to this case, it must resolve two preliminary questions: (1) whether the sham affidavit rule allows the court to strike the declarations of non-party witnesses like Younie; and (2) Whether an expert report provided to defendants pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) may be used as a predicate document with which to compare the affidavit. The court will address each in turn.

1. Application to the Declaration of a Non-party Witness.

Some courts have held that, because they have less incentive than a party-witness to provide untruthful testimony, the sham affidavit rule does not apply to strike the testimony of non-party affiants. For example, in *Nelson* the plaintiff sought to avoid summary judgment by introducing deposition testimony of a witness to his injury. 571 F.3d at 928. The witness's deposition contradicted the plaintiff's own deposition testimony. *Id*. The court found the sham affidavit rule inapplicable:

> The rationale underlying the sham affidavit rule is that a party ought not to be allowed to manufacture a bogus dispute with himself to defeat summary judgment.

> That concern does not necessarily apply when the dispute comes from the sworn deposition testimony of another witness.

*Id*. The *Nelson* court applied the traditional summary judgment standard, and reversed the district court's grant of summary judgment due to the existence of a genuine issue of material fact. *Id*.

The Eleventh Circuit came to a similar conclusion in *Lane v. Celotex Corp.*, 782 F.2d 1526, 1533 (11th Cir. 1986). There, the defendant in an asbestos action filed for summary judgment on the basis that the plaintiff introduced no evidence indicating that the defendant was the source of his asbestos exposure. *Id*. In response, the plaintiff introduced the affidavit of a former co-worker, who recalled using defendant's asbestos-based product while working with plaintiff. *Id*. The defendant moved to strike the affidavit based on the sham affidavit rule because it contradicted the co-worker's deposition testimony from an unrelated lawsuit. *Id*. at 1529. The court declined to strike the affidavit because the affiant was not a party to the lawsuit. *Id*. It reasoned that because the affiant was a disinterested witness, the inconsistency "is more likely the result of his faulty memory than a predisposition to lie." *Id*. The court went on to hold that "[W]hile a district court may find that a *party's* contradictory affidavit constitutes a sham, . . . we would be unable, absent great trepidation, to affirm a similar finding with respect to a disinterested *witness'* contradictory affidavit." *Id.* (emphasis original).

Although the court agrees with the reasoning of the *Nelson* and *Lane* courts, the "disinterested witness" exception does not apply here because the facts of the present case are significantly distinguishable. First, unlike the witnesses in *Nelson* or *Lane*, Younie is not necessarily a disinterested witness. Younie is an expert witness retained by Tarleton who is rendering an opinion favorable to Tarleton. And unlike the *Nelson* and *Lane* witnesses, Younie is compensated for his opinion and has an on-going business relationship with the plaintiff. Consequently, Younie's

incentive to create a question of fact to defeat summary judgment is closer to a party-witness's than to a disinterested witness's. Second, the nature of the "comparative documents" relied upon here is different than those in *Nelson* and *Lane*. In *Nelson,* the court was comparing the plaintiff's deposition to the depositions of disinterested witnesses, and in *Lane*, at issue was the consistency of a disinterested witness's affidavit with that same witness's deposition testimony from an unrelated case. Here, Younie created his Rule 26 expert report and swore to its accuracy. During the pendency of the same case for which he drafted the report, Younie then swore an allegedly contradictory affidavit to support Tarleton's opposition to summary judgment. Further, although expert witnesses are ultimately responsible for reaching their own opinions, attorneys often are involved in framing the issues on which experts render their opinions, FED. R. CIV. P. 26(a)(4); *Gerke v. Travelers Cas. Ins. Co. Of America*, 289 F. R. D. 316, 325 (D. Or. 2013), thus potentially blurring the dividing line between party and expert. For these reasons, the court concludes that extending the sham affidavit rule to an expert witness's declaration is a proper extension of the purposes of the rule, and is not inconsistent with Ninth Circuit precedent.

### 2. Using a Rule 26 Expert Report as a "Comparative Document".

Next, the court must determine whether it may strike an expert witness's affidavit because it is inconsistent with a Rule 26 expert witness report. Courts most commonly apply the sham affidavit rule to cases where a party submits an affidavit which contradicts the party's sworn deposition testimony. *See Yeager*, 693 F.3d at 1080 (comparing an affidavit with deposition testimony), *Kennedy*, 952 F.2d at 264-65 (same). But the rule's application has extended beyond depositions: "This rule . . . applies to conflicts between affidavits and interrogatory responses as well . . . ." *Kibbee v. City of Portland*, No. CV-98-675-ST, 1999 WL 1271868, at *4 (D. Or. Dec.

23, 1999) (*citing Dist. No. 1J Multnomah County v. AcandS, Inc.,* 5 F.3d 1255, 1264 (9th Cir. 1993)). However, "[u]nsworn testimony cannot be the basis for striking subsequent and contradictory sworn testimony." *Kibbee*, 1999 WL 1271868, at *4, *see also Leslie v. Grupo, ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999) (reversing a district court's grant of summary judgment after striking plaintiff's affidavit because it was contradictory to pre-suit correspondence between plaintiff and defendant).

A sworn document, however, is not an indispensable requirement for the sham-affidavit rule's application, when its application is consistent with the rule's purpose. Thus, one court in this district applied the rule to strike an expert affidavit which was "blatantly contradicted by the public record." *Lannaghan v. First Horizon Home Loans*, Civ. No. 10-6156-AA, 2011 WL 3273161, at *8 (D. Or. July 27, 2011). In *Lannaghan*, the plaintiff's expert — a former employee of the defendant — submitted an affidavit regarding an illegal interest-rate increase on plaintiff's loan in 2009. *Id*. at *6. The expert claimed that he "remember[ed] specifically" the sudden illegal rate increase because his "own loan was part of the calamity." *Id*. The court struck the expert's affidavit because public records showed that the expert's testimony was objectively false. *Id*. at *8. In doing so, the court reasoned that "extending the [sham affidavit] rule in this case would serve the same purpose, namely, to prevent plaintiff from creating a factual dispute for the sole purpose of arguing that summary judgment is inappropriate until the dispute is settled." *Id*.

The court concludes that extending the sham affidavit rule to a contradiction between an expert's affidavit and the same expert's Rule 26 report is an appropriate application of the rule because it implements the rule's purpose. First, although Younie issued his expert report as an unsworn document, he swore to its accuracy in a subsequent declaration. Second, as they do other

OPINION AND ORDER - 10                                                                    [RMD]

forms of discovery, including depositions, parties provide Rule 26 expert reports pursuant to their obligations under the Federal Rules of Civil Procedure; parties are entitled to rely on the accuracy, completeness, and truthfulness of the information conveyed through those discovery methods. Further, as with depositions and interrogatories, a party has a duty to supplement and correct an expert report "if the party learns that in some material respect the disclosure . . . is incomplete or incorrect . . . ." FED. R. CIV. P. 26(e)(1).  In sum, the formality, indicia of reliability, and duty to supplement associated with expert reports distinguishes them from unsworn statements upon which the sham affidavit rule generally cannot rest.  Thus, the court concludes that a Rule 26 expert witness report is an appropriate "comparative document" that may be used in applying the sham affidavit rule.

### B.  Clear and Unambiguous Contradiction.

The Ninth Circuit applies the sham affidavit rule "with caution" because of the inherent tension between the sham affidavit rule and "the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence." *Van Asdale,* 577 F.3d at 998.  As a result, the inconsistency between a party's affidavit and previous sworn statement "must be clear and unambiguous to justify striking the affidavit." *Id*. at 998-999. A non-moving party on summary judgment is not precluded from "elaborating upon, explaining or clarifying prior testimony," and should not be penalized for submitting affidavits containing "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence . . . ." *Id.* at 999, *quoting Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

The Ninth Circuit's decision in *Radobenko* contains two clear examples of a plaintiff's inconsistent statements.  There, the court upheld the district court's grant of summary judgment,

during which the district court disregarded plaintiff's supporting affidavit. The affidavit, which the court ruled flatly contradicted his deposition, stated the following:

> 1. Plaintiff Radobenko in his deposition testified under oath that he was offered employment [by a third party]; in the affidavit, later filed in opposition to defendant's motion for summary judgment, he denies that there was any such offer of employment.

> 2. Plaintiff Radobenko in his deposition testified that he agreed to go on a leave of absence with pay to consider the offer of new employment; his affidavit denies this.

*Id*. at 544. The court then discussed a third contradiction which was not as unequivocally contradictory as the other two examples: "3. Plaintiff Radobenko in his deposition testified that he 'quit' the employ of [Defendant]; in his affidavit *and in other deposition testimony*, he denies this." *Id*. (emphasis added). The *Radobenko* court applied the sham-affidavit rule to the plaintiff's affidavit in which plaintiff both agreed with and but also contradicted his internally-inconsistent deposition. *Id*.

Another departure from the "clear and unambiguous contradiction" rule can be found in *Yeager*. 693 F.3d at 1078-79. There, legendary aviation pioneer and Air Force Brigadier General Chuck Yeager sued under the Lanham Act and California state law for violation of Yeager's rights to privacy and publicity. *Id*. During his deposition "Yeager did not recall answers to approximately two hundred questions, including questions on topics central to [the] action." *Id*. at 1079. However, after the defendants filed for summary judgment, Yeager submitted an affidavit which contained a great deal of information he had been unable to recall during deposition. *Id*. The court struck the affidavit under the sham affidavit rule, explaining "[t]his is not a case in which deponent's memory could credibly have been refreshed by subsequent events, including discussions with others or his review of documents, records, or papers." *Id*. at 1081. As a result, the Ninth Circuit found the

district court reasonably concluded that Yeager's affidavit was sham, noting that "[t]he utility of the

sham affidavit rule to maintain summary judgment as integral to the federal rules would be

undermined if we were to hold that the rule did not apply in this case." *Id.* at 1080-81. Thus, the

*Yeager* court recognized the sham affidavit rule should apply to "contradictions" created by a

witness's inability to remember certain information at deposition, and the witness's subsequent

unexplained ability to remember the same information in an affidavit given in opposition to a

summary judgment motion.

Here, the court concludes that Younie's affidavit testimony about the contribution of heat

to the truss collapse is clearly and unambiguously contradictory to his expert report, even though

the Younie Report could be viewed as internally inconsistent. In his report, Younie explains:

> Heat effects on wood are a known factor in the strength reduction of wood. Several
> wood experts have documented this phenomenon. (C.C. Gerhards Report) There is
> no evidence that the heat of the attic had a direct relation to reducing the strength
> properties on the Tarleton truss lumber, but the heat of the days of July 2006 and July
> 2010 is a likely trigger of the bottom chord ruptures.

(Hickman Decl. Ex. 4 at 6.) Younie then concludes:

> Based on the above analysis, the sudden roof collapse in 2011 was directly and
> immediately caused by the weight of contents and equipment, but the wood
> deterioration and elevated attic temperatures contributed to the collapse.

(Hickman Decl. Ex. 4 at 8.) After State Farm filed for summary judgment, Younie declared:

> there is no evidence that the heat of the attic had a direct relation to reducing the
> strength properties of the Tarleton truss lumber. In my role as a forensic expert in
> studying the causes of bowstring truss failures, I continue to look for clues that
> would tie the heat effects of wood to sudden collapses. . . . I have not been able to
> locate any related studies that support my theory of the relationship of elevated
> temperatures and wood truss failures. At this time, I cannot find evidence or data
> that allows me to conclude that heat is a factor or cause of the collapse of Truss D.

(Younie Decl. at 3.) Younie's declaration statement that he found no evidence or data which

allowed him to conclude heat was a factor clearly contradicts with the conclusion of his expert report that heat was a "trigger" of the collapse.

Tarleton argues that Younie's opinion was consistent and unchanging between the report and declaration and that, to the extent it is inconsistent, Younie sufficiently explains the discrepancy. However, review of Younie's deposition discloses the contrary is true – Younie's opinion was not consistent between the two documents.  At deposition, Younie testified that he "changed [his] opinion" on the issue of whether heat contributed to the collapse.  This statement makes clear that Younie intended his Rule 26 expert report to express his opinion that heat was a contributing factor, or "trigger," of the collapse.  Although Younie stated in his declaration that there was no evidence to support the link between attic temperature and wood strength, Younie's turn-about is similar to those the court found fatal in *Radobenko* and *Yeager*.  In his report, Younie cites a scientific study linking high attic temperatures and wood-strength deterioration.  Further, Younie testified at deposition that, "[i]t's known that heat does have effect on wood, has strength-reducing effects on wood. . . .  I've researched the effects and there are papers written on heat effects on wood.  So I would say it's known."

The court also disagrees, as Tarleton argues, it may not conclude that the Younie Declaration contradicts the Younie Report because the report is itself internally inconsistent.  As *Radobenko* made clear, internally inconsistent comparative documents do not foreclose application of the sham affidavit rule.  A contrary conclusion on such facts effectively creates license to provide internally inconsistent Rule 26 reports or deposition testimony as a "hedge" against a sham affidavit rule challenge.  Therefore, the court finds that the Younie Declaration clearly and unambiguously contradicts the Younie Report.

C. *Factually Sham.*

The court also concludes that the Younie Declaration is factually "sham."  First, despite Younie's insistence there was no evidence to support his conclusion, he nonetheless asserts, both before his declaration and after his declaration, that heat "probably contributed to the – to the situation."  (Mockford Decl. Ex. 1 at 7.)  The fact that Younie expressed an opinion contradictory to his declaration both before and after Tarleton submitted his declaration suggests the declaration was intended to avoid summary judgment.  Second, to the extent Younie purports to "change" his opinion, he does based on no new evidence; instead, he claims that he could not find anything to "prove [his] conclusion."  The absence of new evidence distinguishes Younie's change in testimony from other cases in which the court found a party reasonably explained inter-statement inconsistencies by pointing to new evidence that changed the witness's mind.

Accordingly, because on this record Younie's report and declaration are inconsistent and his declaration appears created for the purpose of avoiding summary judgment, the court applies the sham affidavit rule to strike the portions of Younie's declaration which claim heat did not contribute to the collapse.

II.  Motion for Summary Judgment.

State Farm argues it is entitled to summary judgment because Tarleton's loss was not "directly and immediately caused only by" one of the covered causes of loss articulated in the Collapse Endorsement.  Tarleton advances several arguments against summary judgment.  First, Tarleton contents it is entitled to recovery under the general "Losses Insured" section of the policy because it suffered an "accidental direct physical loss," and claims State Farm has not met its burden of showing an exclusion to coverage applies.  Second, Tarleton claims that summary judgment is

inappropriate because the weight of infrastructure added to the building caused the collapse. Thus, its loss was covered under the Collapse Endorsement because it was "directly and immediately caused only by . . . the weight of contents and equipment."

    *A. Applicable Law.*

Federal courts siting in diversity must apply state substantive law and federal procedural law. *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 427 (1996). However, the distinction between the procedural and substantive is not always clear. *Id.* In parsing the procedural from the substantive, courts must determine whether the statute in question has "so important an effect upon the fortunes of one or both of the litigants that failure to apply it" would lead to inconsistent results or would lead to judicial forum shopping. *Hanna v. Plummer,* 380 U.S. 460, 468 n.9 (1965). More recently, the Supreme Court held that a state statute is substantive if it "significantly affects the result of a litigation" on the merits. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406 (2010).

An insurance policy is a contract. *Stewart v. Morosa Bros. Transp. Co.*, 611 F.2d 778, 781 (9th Cir. 1980). The Ninth Circuit, as well as courts in this district, have long held that contract interpretation is a matter of substantive law to which state law applies. *Getlin v. Maryland Cas. Co.*, 196 F.2d 249, 250 (9th Cir. 1952), *Snook v. St. Paul Fire & Marine Ins. Co.,* 220 F. Supp. 314, 316-17 (D. Or. 1963) ("This being a diversity case, jurisdiction is grounded on that fact and the [insurance] policy must be interpreted and construed in accordance with the Laws of Oregon, the place where the contract was made."). "The primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties." *Totten v. New York Life Ins. Co.*, 298 Or. 765, 770 (1985). In Oregon, if the insurance policy does not define the term or phrase in

question, courts resort to a three-step analysis to determine the parties' contractual intent. *Hoffman Constr. Co. V. Fred S. James & Co.*, 313 Or. 464, 469-471 (1992). First, "[i]f the phrase in question has a plain meaning, we will apply that meaning and conduct no further analysis." *Holloway v. Republic Indem. Co.,* 341 Or 642, 650 (2006). Second, "[i]f the phrase in question has more than one plausible interpretation . . . we will examine the phrase in light of the context in which that [phrase] is used in the policy and the broader context of the policy as a whole." *Id*. Third, if any ambiguity remains, the court will construe the disputed language in favor of the insured. *Id*.

  *B.  Direct Physical Loss*.

  Tarleton first argues that summary judgment is inappropriate because the collapse is covered under the general "losses insured" section. That section provides, "[w]e insure for accidental direct physical loss to property covered under the policy unless the loss is:" suffered by property not insured or excluded in the "losses not insured" section. (Grady Decl. Ex. 13 at 13.) According to Tarleton, the collapse caused accidental direct physical loss which was not specifically excluded under the losses not insured section. Thus, the collapse is a covered loss and Tarleton is entitled to reimbursement. The court disagrees.

  "Under well-settled contract principles, specific provisions control over more general terms." *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997). In this case, the "accidental direct physical loss" language articulates policy coverage in very general terms, whereas the Collapse Endorsement specifically defines the bounds of coverage relating to "direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building." Thus, the specific language of the collapse endorsement controls the more general language of the "losses insured" section, and precludes recovery under the language cited by Tarleton. If Tarleton

is entitled to recovery in this case, it must be under the Collapse Eendorsement.

C. *Coverage Under the Collapse Endorsement.*

State Farm contends that Tarleton's loss is not covered by the Collapse Endorsement. The Collapse Endorsement, which articulates the limits of coverage in the event of "the sudden, entire collapse of a building," provides that State Farm will cover collapse damage only if the collapse was "directly and immediately caused only by . . . the weight of contents and equipment." State Farm's summary judgment claim, therefore, depends on two questions. First, whether the new roof and building materials which exerted dead weight on the trusses are "contents and equipment," and second, whether the collapse was "directly and immediately caused only by" the weight of those "contents and equipment."

1. Contents and Equipment.

The court must first address whether the Building's air conditioners, electrical wiring, ceilings, and roofing material constitutes "contents and equipment" under the Policy. State Farm argues that the materials Tarleton added to the building, including roofing material, are not "contents and equipment" under the plain meaning of the term. Because the policy does not cover collapses caused by the weight of roofing material, it argues, Tarleton cannot recover and the court should grant summary judgment. Tarleton points out that State Farm's expert concluded in his report that "additional layers of roofing, HVAC units (e.g. air handlers), ducts, steel pipe, PEX tubing, copper pipe, metal electrical conduits, wires . . . , plastic pipe (e.g. PVC, ABS), batt insulation, suspended ceilings, lights and wood platform . . ." were the primary cause of the collapse.

Under the Oregon approach to contract interpretation, the court first examines whether the phrase "contents and equipment" has a plain meaning. When divining the plain and ordinary

meaning of a term, courts frequently resort to dictionary definitions for guidance. *See Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507, 1513 (9th Cir. 1991) (Using dictionary definitions to determine the "lexicon of the ordinary person" and "plain meaning of the term 'damages.'"), *Pension Trust v. Travelers Cas. & Sur. Co. Of Am.,* 235 Or. App. 573, 584 (2010) ("[W]e generally turn to dictionary definitions to determine the ordinary meanings of undefined terms . . . ."). The American Heritage Dictionary defines "contents" as "[s]omethign contained, as in a receptacle." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 396 (5th ed. 2011) It defines "contain" as follows:

1.   a. To have within; hold *a bin that contains rice.*
     b. To be capable of holding:  *These barrels contain 50 gallons.*

2. To have as a component or constituent part; include: *Does the soup contain meat?  The poem contains many famous lines.*

*Id*. (emphasis original).   The court finds that the plain-meaning of the term "contents" is unambiguous, and concludes the parties intended it to mean "to have within," or "to have as a component or constituent part."  As applied to the Policy, the contents of the Building includes anything housed within the confines of the outer shell of the Tarleton Building, including walls, platforms, ceilings, electrical wiring, duct work, and air conditioning units.

A more difficult question is whether roofing material added to the Tarleton Building constitutes "contents or equipment."  In his report, State Farm's expert wrote, "[a]dditional materials and equipment have accumulated over time on and within the building, and those items contributing to dead load on the trusses may include additional layers of roofing . . . ."  (Grady Decl. Ex. 11 at 4.)  Although the expert's characterization of the roof as "materials and equipment" is probative to whether the roof falls within the plain meaning of "contents and equipment," it is not dispositive.

It is a attenuated reasoning to categorize a roof as the "contents" of a building, as the roof is part of the structure which contains the Building's contents. It would be contrary to the term's conventional use in the English language to say that a building "contains a roof."

Whether roofing material is "equipment" is a closer question. The American Heritage Dictionary defines "equipment" as "[s]omething with which a person, organization, or thing is equipped," and defines "equip" as "[t]o supply with necessities such as tools or provisions." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE at 602. An amalgamation of these terms yields the following definition: "the necessities such as tools or provisions, with which a person, organization, or thing is equipped." Reasonable persons could disagree on whether that definition properly applies to a roof or roofing materials. As it is used in plain language, a roof is seldom referred to as "equipment." Nevertheless, the term's ordinary usage includes statements that a building is "equipped with a roof." Thus, the term equipment is susceptible to multiple interpretations, and is ambiguous. The court, therefore, must move to step two and analyze whether "equipment" is unambiguous when viewed in the context of the policy as a whole.

At step two, it becomes clear that the parties intended roofing material to be "contents and equipment." The Collapse Endorsement articulates the circumstances under which the collapse of a building will be covered by the policy. Under State Farm's proposed definition of "contents and equipment," subsection (b) of the collapse endorsement, which purports to cover collapses due to the weight of contents and equipment, would be rendered inoperative. Roofing, as the topmost material in a structure, inevitably exerts weight upon a building's structural supports — here, the bowstring trusses. Thus, a building can never collapse only under the weight of "contents, equipment, animals, or people" if that phrase was intended to exclude roofing material because the

weight of the roof inevitably contributes the dead load which results in collapse. The same result would occur if State Farm's logic were applied to other portions of the Collapse Endorsement. Subsection (c) provides that the policy will cover collapses which occur due to the "weight of ice, snow, sleet or rain which collects on a roof." Adopting State Farm's proposed definition of contents and equipment would render Subsection (c) inoperative as well, as the weight of a roof will inevitably combine with that of the ice, snow, sleet, or rain to cause the structural supports to collapse. Upon analyzing the definition of "contents and equipment" in the context of the Collapse Endorsement, it would be unreasonable to adopt State Farm's proposed definition. Therefore, the court agrees with Tarleton that the building's roof, ceilings, electrical wiring, duct work, and other building materials which exhibited dead weight on the trusses were "contents and equipment" as contemplated by the parties to the Policy.

2.    Directly and Immediately Caused Only By.

State Farm next argues that because multiple forces contributed to the collapse, it was not "directly and immediately caused only by" the weight of contents and equipment. In support of its argument, State Farm urges the court to use a plain-meaning interpretation of the phrase at issue, and find that because multiple factors "caused" the rupture, the rupture was not "caused only by" the weight of contents and equipment. Tarleton, however, claims that the phrase is ambiguous, even after analyzing the phrase in the context of the policy as a whole, and should thus be construed in its favor.

The Policy does not define "directly and immediately caused only by," so the court must engage in the three-tiered interpretation process. Black's Law Dictionary contains an extensive section devoted to defining the word "cause." BLACK'S LAW DICTIONARY 250 (7th ed. 2009).

Notably, it defines "cause" as "something that produces an effect or results; "immediate cause" as "[t]he last event in a chain of events, though not necessarily the proximate cause of what follows;" and "direct cause" with reference to "proximate cause." *Id*. However, Black's defines "direct" as follows:

> direct(di-**rekt**), *adj*. **1.** (Of a thing) straight; undeviating <a direct line>. **2.** (Of a thing or person) straightforward . . . . **3.** Free from extraneous influence; immediate <direct injury>. **4.** of or relating to passing in a straight line of descent, as distinguished from a collateral line.

*Id.* at 525. Similarly, the American Heritage Dictionary defines "direct" as: "3. Having no intervening persons, conditions, or agencies; immediate: *direct contact; direct sunlight*."

In *Bjugan v. State Farm Fire and Cas. Co.*, a court in this district provided a workable plain-meaning definition for the phrase "directly and immediately caused by" as used in a State Farm insurance policy. No. 3:12-cv-01423-HU, 2013 WL 4591111, at *1 (D. Or. Aug. 28, 2013). There, the plaintiffs filed an insurance claim to cover damage to a rental property caused by the tenant's ninety-five cats and two dogs. *Id*. However, the policy specifically excluded from coverage damage caused by domestic and wild animals. *Id*. Plaintiffs argued that the phrase "direct and immediate cause" meant "proximate cause," and because the owner's negligence and animal hoarding was the primary proximate cause of the animal damage, they were entitled to reimbursement. *Id.* at *5. The court disagreed and held that the phrase "directly and immediately" modified the word "cause" to make it much narrower than traditional notions of "proximate cause." *Id*. at *7. The court ultimately concluded that the "direct and immediate cause" was that which was closest in time to the ultimate damage. *Id*. Because the damage was caused closest in time by the animals, it fell outside the policy coverage. *Id*.

Although *Bjugan* is not mandatory authority, the court is persuaded by its sound reasoning.

But the *Bjugan* holding does not wholly resolve the dispute now before the court because the language of the Policy in this case is slightly different. The *Bjugan* policy covered damage that was "directly and immediately caused by" forces articulated in the insurance policy, whereas the Policy in this case is more narrowly drawn to reimburse for damage "directly and immediately caused *only* by" named causes  Nevertheless, *Bjugan* provides guidance for defining the phrase "direct and immediate." In *Bjugan*, the tenants's negligent ownership of the damage-causing pets was not a direct and immediate cause because it was more temporally distant than the actions of the pets themselves. Instead, it was a proximate cause which led to ultimately led to the direct and immediate cause of the damage. Thus, those causes which ultimately lead to other, more direct and immediate causes are not themselves "direct and immediate." Here, Nelson's negligence led to the excessive weight of building infrastructure on the trusses, but like the *Bjugan* tenant's negligence, was temporally distant and fell outside the definition of "direct and immediate cause." Similarly, the poor design of the trusses and use of green wood in the truss' original construction is temporally distant from the collapse, and does not constitute a "direct and immediate cause." Remaining are two potential direct and immediate causes:  the weight of contents and equipment and the high temperatures during the days surrounding the collapse.

State Farm next argues it is entitled to summary judgment even if the court adopts *Bjugan* and eliminates negligent design, construction, and remodeling as direct and immediate causes because according to Younie, the collapse resulted from both the high attic temperatures prior to the collapse and the weight of contents and equipment. State Farm argues that Younie's analysis should compel the court to draw one of two conclusions: (1) because the heat was a contributing cause, the collapse was not directly and immediately caused only by the weight of contents and equipment or

(2) that the heat, as the variable which changed closest in time to the collapse, was the only direct and immediate cause of Tarleton's loss. The court agrees with State Farm, and concludes that, even if it adopts Tarleton's proposed definition, State Farm is entitled to Summary Judgment.

For Tarleton's claim to survive summary judgment, the collapse must have been "directly and immediately caused only by" the weight of contents and equipment. The phrase at issue is open to multiple interpretations, and is ambiguous. However, even if the court accepts the definition proposed by Tarleton, State Farm is entitled to summary judgment. The American Heritage Dictionary of the English Language defines "only" as "[w]ithout anyone or anything else; alone." Tarleton does not claim that the word "only" is ambiguous or susceptible to multiple interpretations, so the court will construe it according to its plain meaning. The plain meaning of "only" as used in the phrase at issue means that the policy will cover Tarleton's loss if the bowstring trusses ruptured due to the weight of contents and equipment alone, without another direct and immediate cause contributing to the collapse.

Here, Tarleton's expert opined in the Younie Report, and again at deposition, that hot air in the Building's attic prior to the collapse weakened the wooden trusses and contributed to the collapse — going so far as to call the attic temperatures a "trigger" of the collapse. The collapse, therefore, was not caused by the weight of contents and equipment "without anyone or anything else," but occurred due to the combination of multiple causes. The reasoning of the *Bjugan* court provides further support for the court's conclusion. As discussed *supra*, *Bjugan* declared that a direct and immediate cause is that which is closest in time to the damage at issue. Here, dead load in the form of air conditioning equipment, "wires, suspended ceilings, ceiling joists, and insulation" were added between 2007 and 2011, but the truss did not collapse immediately after the new

equipment was installed.  The cause which had the closest temporal relationship to the collapse, and was most variable in the time-period preceding the collapse, was the attic temperature.  If there is one direct and immediate cause which was "closest in time" to the events in question, it was the high temperature in the Tarleton building's attic.  Thus the court concludes that Tarleton's loss was not "directly and immediately caused only by the weight of contents and equipment, and State Farm did not breach the insurance policy by refusing coverage.

*Conclusion*

For the reasons stated, State Farm's motion for summary judgment (Dkt. No. 37) is GRANTED.

IT IS SO ORDERED

DATED this 21st day of May, 2014.

<div style="text-align:right">

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge

</div>